**Anthony D. HARDNETT,
Petitioner–Appellant,**

v.

**Charles D. MARSHALL, Respondent–
Appellee.**

No. 93–15857.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 14, 1994.

Decided June 6, 1994.

As Amended Aug. 26, 1994.

Before: SCHROEDER and NOONAN, Circuit Judges, and JONES *, District Judge.

Opinion by Judge NOONAN; Concurrences by Judges SCHROEDER and JONES.

NOONAN, Circuit Judge:

This case involves a difficult question of whether a prosecutor's violation of a criminal defendant's rights under the Confrontation Clause, as applied to California by the Due Process Clause, was of a character to warrant the grant of habeas corpus. The issue is close. The case is as follows:

In the early hours of October 7, 1989, at the Winsor Hotel, 20 Sixth Street between Market and Mission Streets, San Francisco, a block away from this Court of Appeals and two long blocks from City Hall, Vance Outlaw was stabbed to death. There is no doubt as to who stabbed him. They were David Eng and his twin sister Denise and the petitioner in this case, Anthony Hardnett. Of the three, Hardnett alone seeks habeas, alleging a violation of his right of confrontation that affected his defenses of voluntary or involuntary manslaughter.

The violation of the constitutional right is clear. Our task is to determine whether the violation was so gross that no actual prejudice analysis is necessary or, if such analysis may be made, whether the state of California has shown that Hardnett suffered no actual prejudice with the jury. With these questions in mind we set out the facts and proceedings.

## FACTS

The state's only witness to the killing, Roberta Espejo, shared an apartment at 1951 Oak Street, San Francisco, with her boyfriend David Eng; his twin sister Denise Eng; their father; and Denise's boyfriend, Anthony Hardnett. Hardnett by his own admission was a dealer in cocaine; Denise sometimes helped him in this enterprise. Denise, a former prostitute, worked part-time as a construction worker and limousine chauffeur; Hardnett had lived with her since June 1986. At times Hardnett and Denise

J. Bradley O'Connell, First Dist. Appellate Project, San Francisco, CA, for petitioner-appellant.

Ronald S. Matthias, Deputy Atty. Gen., San Francisco, CA, for respondent-appellee.

* Honorable Robert E. Jones, United States District Judge For the District of Oregon, sitting by designation.

rented a room at the Winsor to escape the crowded conditions of the Oak Street apartment.

According to Roberta Espejo, at about 2:00 a.m. on October 7, 1987 Denise and Hardnett arrived at the Oak Street address. Denise was crying and upset, her clothing in disarray; Hardnett was depressed and crying. Denise asked her brother David to take care of a pimp who had dissed her; the dissing or disrespect had consisted in slapping her and stripping her. David said he would take care of it. Thereupon David picked up a letter opener 6–8 inches in length in the form of a Spanish sword; Denise picked up a fondue fork; Anthony got a steak knife. The three, accompanied by Roberta, went by cab to the Winsor.

At the corner of Market and Sixth, Denise pointed out Vance Outlaw as the man who had dissed her. The four ignored him and proceeded into the Winsor. They then waited in the room Denise and Hardnett had rented the day before. A little later Outlaw knocked on the door and peered in. David Eng and Hardnett, who had previously sold him drugs, invited him to enter. Immediately on his entrance he was rushed and stabbed by David and Hardnett. Denise attacked his leg with the fondue fork. The struggle continued. David and Hardnett pinned him on the bed and attempted to smother him. Ultimately they stabbed him in the throat. The killers left the Winsor without being detected. When Outlaw's body was examined, it was found that twenty-nine wounds had been inflicted on him by sharp instruments. The domestic weaponry of the Engs and Hardnett was still on the murder scene, the fondue fork and the steak knife both covered with human blood, the letter opener in Outlaw's throat.

The police were at first unable to determine who had done the deed. The story of what had happened came to light only after Roberta Espejo split with David Eng in January 1988. She confessed to the police in June of that year.

The only defendant to testify was Hardnett. On the essential question of the circumstances in which he killed Outlaw his testimony differed from that of Roberta Espejo. According to his account, Hardnett and Denise were staying at the Winsor on October 6. They knew Outlaw as a customer of Hardnett's cocaine. They also were aware of his violent treatment of women. "Bitches ain't life," Outlaw had told Hardnett.

Denise went to Outlaw's room to borrow a coat hanger to use as a pipe cleaner so she and Hardnett could smoke drugs. After the pipe was cleaned Denise returned the hanger but did not come back. Hardnett went to Outlaw's room to look for her. He found her stripped and beaten by Outlaw with Outlaw holding a knife to her throat. Denise said that Outlaw wanted her to whore for him and that, as she had refused, "He's going to kill me." Hardnett asked, "Why did you do this to my woman?" Outlaw replied, "The bitch is dead meat. You ain't safe on Oak Street." He assured Hardnett that he had a gat and would kill him too.

Hardnett and Denise then took a cab to Oak Street. They discovered that Denise had left the keys to the apartment in Outlaw's room. David Eng let them in to the apartment and Denise told David, "The pimp dissed me." David wanted to talk to the man and find out why he had mistreated his sister. There was a need to retrieve the Oak Street keys. The trio took a taxi to the Winsor.

As they waited for Outlaw in Hardnett's room at the Winsor he walked in, stating, "I told you I was going to do that. I got that thing." Hardnett believed that Outlaw was about to kill him. He panicked, stabbing him with the steak knife he usually carried for protection and which was already in the room, not brought from Oak Street. Hardnett was not aware of how many times he stabbed Outlaw or of what David or Denise was doing. He stopped when he was no longer in danger.

## PROCEEDINGS

Denise Eng, David Eng and Hardnett were tried in San Francisco Superior Court for murder. The trial court granted an in limine motion of the defendants to exclude the out-of-court statements of Denise to the police. At the trial, however, on cross-exami-

nation of Hardnett, the following exchanges between the prosecutor and Hardnett occurred:

1. Q. Isn't it true you wanted Denise to start boosting and she said no and you started slapping her around at Fisherman's Wharf?

   A. No.

   Q. So if Denise told Inspector Gerrans that she would be lying, is that correct?

   [defense objection sustained by court]

2. Q. So if Denise told that to Inspector Gerrans they would be lying[?]

   [defense objection sustained by court]

3. Q. And it's your testimony that you did not beat up Denise at Pier 39?

   A. Yes. I didn't.

   Q. How would you explain Denise saying you did?

   [defense objection sustained by court]

On a fourth occasion the prosecutor asked Hardnett whether he had gone back to the Oak Street apartment to obtain David Eng's assistance. Hardnett denied that he had, stating, "No, I didn't say—." Before he could finish, the prosecutor asked:

4. Q. Isn't it true ["]I'm going to get that mother fucker? I got my knife and I'm going to get that now["]?

   A. No. I didn't say—

   Q. And if Denise said that, she would be lying?

As it had to the previous three questions the trial court sustained the defense objection. The court also admonished Williams, the prosecutor, saying, "Mr. Williams, don't make reference to a witness' statement—this is the witness who's testifying—or alleged statement." The court rejected a defense motion for a mistrial. The court gave the standard instruction to the jury that the statements of the lawyers were not evidence. The jury convicted all three defendants of second degree murder.

The court denied a motion for a new trial, finding that Williams' questions had been asked "in good faith" and that the court had instructed the jury so that it would not consider them as evidence.

On appeal to the Court of Appeals for the First Appellate District the three defendants urged that the misconduct of the prosecutor in Hardnett's cross-examination required reversal. That court observed that the misconduct "involved rather blatant attempts by the prosecutor" to circumvent the rule excluding incriminating statements by a non-testifying defendant. The court characterized the prosecutor's conduct as "decidedly unprofessional" but noted that the only question which bore directly on Hardnett's guilt, the question about his threat to use his knife, was worded in a way that "was fortunately vague and confused." It added that as the jury was "effectively informed that the question was out of bounds, it could be reasonably presumed that the jury had not relied upon it." In any event, the appellate court concluded, "The evidence of appellants' guilt was overwhelming and so the misconduct was harmless beyond a reasonable doubt."

The California Supreme Court denied Hardnett's petition for review. He thereupon brought pro se a petition for habeas corpus in the federal district court. Counsel was appointed for him. The magistrate judge filed a report recommending denial of the petition because, although the cross-examination had violated his Confrontation Clause rights, Hardnett had not been prejudiced. The district court followed the magistrate's recommendation and denied Hardnett's petition. Hardnett appeals.

## ANALYSIS

■ *The Constitutional Right Violated.* The Sixth Amendment guarantees to every defendant the right to examine the witnesses against him. When prosecutor Williams introduced in the form of questions the statements made out of court by Denise Eng, Williams was introducing by hearsay the words of a witness whom Hardnett could not cross-examine because Denise Eng had invoked her own privilege against self-incrimination and was not a witness at the trial. Williams' misconduct was not only a violation of the defendant's constitutional rights. It was a direct violation of the court's order excluding such statements under the authori-

ty of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

We are bound to defer to the factual findings of the state courts. 28 U.S.C. § 2254. The trial court found that the prosecutor had acted in good faith; the First Appellate District characterized his conduct as "rather blatant attempts" to circumvent a constitutional requirement and "decidedly unprofessional." No doubt, the prosecutor, like most prosecutors, believed in his case. From his perspective, he was doing justice by securing the conviction of three bloodstained murderers. To this degree he was acting in good faith. But a prosecutor, however anxious to uphold justice by a conviction of the guilty, must act within the bounds of the profession and observe the rights guaranteed to the defendant by the Constitution. When the prosecutor acted unprofessionally, when he disregarded the *Bruton* rule and violated Hardnett's constitutional right, he ceased to be in good faith; he was guilty of the misconduct found by the First Appellate District. The misconduct introduced matter bearing on the intent with which Hardnett had killed and therefore impacted his possible defenses of voluntary or involuntary manslaughter.

As the prosecutor's references to Denise Eng's out-of-court statements were in the form of questions, there was, it is argued, no evidence submitted by the prosecution as to their content; and it is true that the prosecutor did not argue the statements to the jury. Nonetheless, the effect of the prosecutor's questions was to insinuate not at all subtly that he had in his possession statements by Denise Eng that corresponded to the statements he put in the form of questions. Evidence could have been disputed. The prosecutor's remarks instilled a poison which the defense could not drain from the case.

The judge's sustaining of the objections, his rebuke to Williams and his general instruction to the jury on lawyers' statements, it is argued, were enough to cure the misconduct. However, the judge's mild admonition to the prosecutor was put in such a way that it magnified the problem by referring to Denise's statement as that of "a witness." The general instruction was not tied in any way to the specific questions introduced by Williams. Where misconduct has been as blatant as Williams' was, and the inadmissible testimony as relevant as it was, we cannot presume that the jury paid no attention to it; rather, we adopt the realistic view of the First Circuit that the kind of impression made could not be cured by an instruction. *See Robbins v. Small,* 371 F.2d 793, 796 (1st Cir.1967). Consequently, the court's refusal to declare a mistrial was error, and it was error not to grant a new trial.

■ *The Applicable Standard.* The Supreme Court has laid out two broad kinds of constitutional violations that may occur in a criminal proceeding. One is "structural" affecting the basic elements of a trial. Such would be a biased judge or denial of counsel. The other is "trial error," a constitutional mistake made in the course of the trial. The first kind of violation vitiates the proceedings; it may not be considered harmless. The second kind is not necessarily fatal; it may, in the light of the whole record, be found not to have caused actual prejudice. *Brecht v. Abrahamson,* — U.S. —, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). There is also a hybrid, which is laid out in footnote nine of *Brecht* as follows: "the unusual case" in which there occurs "a deliberate and especially egregious error of the trial type, or one that is so combined with a pattern of prosecutorial conduct" as to "infect the integrity of the proceedings" and "warrant the grant of habeas relief even if it did not substantially affect the jury's verdict." *Id.* at —, n. 9, 113 S.Ct. at 1722, n. 9. This hybrid, Footnote Nine error as we denominate it, is thus assimilated to structural error and declared to be incapable of redemption by actual prejudice analysis. The integrity of the trial, having been destroyed, cannot be reconstituted by an appellate court. We assume that the facts set out in Footnote Nine are illustrative, not exhaustive, and that the key consideration is whether the integrity of the proceeding was so infected that the entire trial was unfair. The case before us presents the question whether Footnote Nine error of this sort occurred here.

*Footnote Nine Error?* In approaching this question, the determination of the burden of proof has importance. *Brecht* de-

pends upon *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) and its interpretation of the rule governing federal appeals, then embodied in the Judicial Code § 269, 28 U.S.C. § 391, now 28 U.S.C. § 2111, which, as revised, states that appellate judgment is to be given "without regard to errors or defects which do not affect the substantial rights of the parties." *Kotteakos*, following the legislative history of the statute, appears to endorse the view that if the error was such that "its natural effect" was to prejudice "a litigant's substantial rights," the burden of proof falls on the party defending the verdict. *Id.* at 760, 66 S.Ct. at 1246. But *Brecht*, —— U.S. at —— – ——, 113 S.Ct. at 1720–1721, speaks of a state judgment as presumptively correct and of habeas petitioners not obtaining relief based on trial error "unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, it may be argued, did not repudiate past practice and shift the burden; this is the interpretation given the opinion by the concurring opinion at ——, 113 S.Ct. at 1723, and there is no explicit repudiation or rebuttal of the concurrence in the main opinion. A constitutional violation usually has the "natural effect" of acting upon the litigant's substantial rights. On the other hand, if a state judgment is presumptively correct, it would seem that the burden fell on the petitioner challenging it, and that is how we applied *Brecht* in *Castillo v. Stainer*, 997 F.2d 669 (9th Cir.1993); *see also Jeffries v. Blodgett*, 5 F.3d 1180, 1190 (9th Cir.1993). We need not resolve the question here, because even assuming that the prosecution should have the burden of proof, it has shown, first, that the error here was not Footnote Nine error and, second, that the error did not cause actual prejudice to Hardnett.

■ The prosecutorial misconduct was egregious—the introduction of inadmissible hearsay, the violation of the court's in limine ruling, the ignoring of the court's three evidentiary rulings culminating in the prosecutor's fourth objectionable question, the blatant violation of *Bruton* and of Hardnett's right to confront the witness quoted against him. There was trial error, the failure to grant the requested mistrial and the requested new trial. The pattern of egregious misconduct was not cured because of these errors, which themselves were therefore arguably egregious. But a subsidiary question must be resolved before Footnote Nine is satisfied: Is this "the unusual case" where the combination of misconduct and error infected the entire proceeding and destroyed its fairness? The answer requires consideration of California's statutory provisions on killing.

To convict of second degree murder the prosecution had to prove the unlawful killing of a human being with malice aforethought. Cal.Penal Code § 187(a). Malice is "express when there is manifested a deliberate intention to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." *Id.* § 188. First degree murder, so far as relevant here, is all murder perpetrated by "lying-in-wait, torture, or by any other kind of willful, deliberate, and premeditated killing." All other kinds of murder are of the second degree. *Id.* § 189. Voluntary manslaughter is killing "upon a sudden quarrel or heat of passion." *Id.* § 192(a). Involuntary manslaughter is killing in "the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection." *Id.* § 192(b). Imperfect self-defense, i.e., the actual but unreasonable belief that one is in imminent danger of death or great bodily injury, negates malice and thus provides the basis for a verdict of manslaughter rather than murder. *In re Christian S.*, 7 Cal.4th 768, 773–83, 30 Cal. Rptr. 33, 872 P.2d 524 (1994); *People v. Flannel*, 25 Cal.3d 668, 674–80, 160 Cal.Rptr. 84, 603 P.2d 1 (1979).

Denise Eng's out-of-court statements only bear on the intent with which Hardnett left the apartment to go to the Winsor, and this intent became irrelevant when the jury determined that Hardnett was not guilty of first-degree murder. So finding, the jury rejected the prosecution's theory that Hardnett and the Engs were lying-in-wait for Outlaw, despite the prosecution on this appeal arguing that the trio had prepared an ambush. The verdict also rejected the idea the killing was by torture or was "willful, deliberate and premeditated." As Denise Eng's statement only went to prove such premeditation, and the jury did not find it proven, the prosecutor's misconduct did not infect the whole trial. The poison was not

removed from the case but it was confined and did not spread to the entire trial. Footnote Nine error demonstrably did not occur.

*Actual Prejudice?* The prosecution shows no "actual prejudice" by pointing to the crime of which Hardnett was convicted. The worst of Denise Eng's inadmissible hearsay did not prove him guilty of this crime. The rest of her statements that the prosecutor brought in were unflattering to Hardnett but tended to prove nothing as to the offense charged. Hardnett argues that all of the Denise Eng hearsay tended to corroborate Roberta Espejo's testimony and make it credible. We hold the corroborative effect de minimis, especially as the jury, if it had fully credited Espejo, would have returned a verdict of first degree murder. Before the jury was Hardnett's implausible story of the location of his steak knife at the Winsor, his implausible story that he did not know what the Eng twins were doing as he attacked Outlaw, the three bloodied weapons of the defendants, and the fact no gun was shown to have been in Outlaw's hands when he entered Hardnett's room, and the twenty-nine wounds to which Outlaw succumbed. No actual prejudice was suffered by Hardnett in the face of this daunting evidence of his intent to kill.

**AFFIRMED.**

SCHROEDER, Circuit Judge, concurring:

I concur in the judgment and with all of the majority's opinion except the interpretation of footnote nine of *Brecht v. Abrahamson,* —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). That troublesome footnote creates a special category of "deliberate and especially egregious error[s] of the trial type" for which habeas relief is available even if the error "did not substantially influence the jury verdict." In my view, this special category of "trial error" is one for which reversal is required unless the state can show the error to have been harmless beyond a reasonable doubt. Because I conclude that the prosecutorial misconduct in this case, although serious, could not have affected the jury's deliberation in any way, I agree with the majority that habeas relief is not warranted.

The majority opinion, however, while concluding that any error in this case was harmless, equates the new category of footnote nine error with "structural error" that requires automatic reversal or habeas relief. *See Brecht,* —— U.S. at ——, 113 S.Ct. at 1717; *Arizona v. Fulminante,* 499 U.S. 279, 290, 111 S.Ct. 1246, 1254, 113 L.Ed.2d 302 (1991). Structural errors have included, for example, deprivation of the right to counsel, denial of trial by an impartial judge, or denial of a public trial. *Arizona v. Fulminante,* 499 U.S. 279, 290, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (citing *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), and *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984)). Structural error, until now, has never been equated with discrete, albeit deliberate and egregious, errors during trial. The majority opinion thus injects further confusion in an area that is confused enough already.

The Supreme Court's principal holding in *Brecht* established the standard for determining the point at which trial errors become sufficiently prejudicial to warrant habeas relief. Prior to *Brecht,* the Court had held that constitutional error requires reversal unless the state can show that the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In *Brecht,* the Court rejected use of the *Chapman* standard in habeas cases, looking instead to whether the error " 'had a substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht,* —— U.S. at ——, 113 S.Ct. at 1722 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). Under this, the *Kotteakos* standard, a petitioner must show "actual prejudice." *Id.*

In footnote nine, the Court identified an exception to its holding:

Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to

warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict. *Cf. Greer v. Miller*, 483 U.S. 756, 769 [107 S.Ct. 3102, 3111, 97 L.Ed.2d 618] [ (1987) ].

*Brecht*, —— U.S. at —— n. 9, 113 S.Ct. at 1722 n. 9.

The majority concludes that footnote nine errors cannot be saved by harmless error review under either *Chapman* or *Kotteakos*. But the footnote itself does not say that. What it does say is that such error is grounds for habeas relief "even if it did not substantially influence the jury's verdict." The text in the paragraph just before the marker for footnote nine makes it clear that this is a reference to the *Kotteakos* test. *Brecht*, —— U.S. at ——, 113 S.Ct. at 1722 ("The test under *Kotteakos* is whether the error had a 'substantial and injurious effect or influence in determining the jury's verdict.' ").

Footnote nine's reference to *Greer v. Miller*, 483 U.S. 756, 769, 107 S.Ct. 3102, 3111, 97 L.Ed.2d 618 (1987), is not particularly illuminating and does not support the majority. The portion of *Greer* cited by the Court is a concurring opinion by Justice Stevens, expanding upon his description, first articulated in *Rose v. Lundy*, 455 U.S. 509, 543–45, 102 S.Ct. 1198, 1216–17, 71 L.Ed.2d 379 (1982) (Stevens, J., dissenting), of the type of errors requiring habeas relief. According to Justice Stevens, habeas relief is warranted only for "those errors that are so fundamental that they infect the validity of the underlying judgment itself, or the integrity of the process by which that judgment was obtained." *Greer*, 483 U.S. at 768, 107 S.Ct. at 3110 (quoting *Rose*, 455 U.S. at 543–44, 102 S.Ct. at 1216–17). Justice Stevens concurring opinion in *Greer* does not even discuss "structural error." It is about when *Doyle* error may lead to habeas relief.

I therefore cannot agree with Judge Jones' concurrence in this case concluding that Justice Stevens was discussing structural error requiring automatic habeas relief without regard to any prejudice analysis. Even if Justice Stevens' opinion were capable of such an interpretation, I find it difficult to believe that the Supreme Court adopted it in *Brecht* by such an oblique citation in a footnote. Because the entire issue in *Brecht* was whether *Kotteakos* or *Chapman* review should be applied to trial errors in habeas proceedings, and because the Court adopted the *Kotteakos* standard, footnote nine's exception is most reasonably interpreted as preserving such errors for *Chapman* review.

By analogizing footnote nine trial error to "structural error," the majority blurs and weakens the concept of structural error. It makes habeas review more difficult. The reason that structural errors require reversal without any analysis of prejudice is because they defy prejudice analysis. *Fulminante*, 499 U.S. at 309–11, 111 S.Ct. at 1265. The problem with the majority's position in this case is demonstrated by the fact that in order to determine whether footnote nine error has occurred—i.e., whether the errors in this case have "so infect[ed] the integrity of the proceeding"—the majority reviews for prejudice. Thus, in order for the majority to conclude that the jury must have rejected the prosecutor's improper references to out-of-court statements, the majority must engage in harmless error analysis that is inappropriate for determining structural error.

It admittedly is difficult to conceive of a class of errors which infect the integrity of proceedings but are harmless beyond a reasonable doubt. But it is at least as difficult to envision the class of errors, expressly described in footnote nine, that infect the integrity of the proceedings but are not actually prejudicial. *Cf. Brecht*, —— U.S. at —— ——, 113 S.Ct. at 1724–25 (Stevens, J., concurring) (noting the relative insignificance of the difference between the *Kotteakos* standard and the *Chapman* standard). If there exists a category of trial-type errors, repugnant to the integrity of criminal proceedings, which are identifiable without resort to actual prejudice analysis, I can only conclude that such errors are subject to the *Chapman* standard.

I therefore find it unnecessary to determine whether footnote nine error, whatever it may be, has occurred in this case. Even assuming the error in this case has infected the integrity of the proceedings, and the *Brecht/Kotteakos* actual prejudice standard

therefore does not apply by virtue of footnote nine, the error was harmless beyond a reasonable doubt.

ROBERT E. JONES, District Judge, concurring:

I join Judge Noonan's interpretation of footnote nine of *Brecht v. Abrahamson,* — U.S. ——, —— n. 9, 113 S.Ct. 1710, 1722 n. 9, 123 L.Ed.2d 353 (1993), and, because I share a concern for the implications of this interpretation, I write separately to set forth my analysis.

There are two main categories of constitutional violations that can occur in a criminal proceeding. A "structural error", such as occurs when the judge is biased or the defendant is denied counsel, affects the basic elements of the trial and requires reversal; it may not be considered harmless. A "trial error" is a constitutional mistake made in the course of presentation of the case to the jury and is subject to review for harmless error.

There are also two types of harmless-error review. "*Chapman*" review considers whether the error is harmless beyond a reasonable doubt. "*Kotteakos*" review considers whether the error resulted in actual prejudice. The *Chapman* standard applies in cases of direct review. The *Kotteakos* standard applies on collateral review—this is the holding of *Brecht,* arrived at in part because there is no reason for the federal courts to conduct the exact same review as the state courts.

In footnote nine of *Brecht,* the Supreme Court identified a third possible category of constitutional violation, as follows:

Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, *might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict.* Cf. *Greer v. Miller,* 483 U.S. 756, 769, 107 S.Ct. 3102, 3110, 97 L.Ed.2d 618 (1987) (Stevens, J., concurring in the judgment). We, of course, are not presented with such a situation here.

—— U.S. at —— n. 9, 113 S.Ct. at 1722 n. 9 (emphasis added). The problem is, the Court did not specify whether this hybrid case is a trial error subject to either *Chapman* or *Kotteakos* harmless-error review, or whether it is considered a structural error requiring automatic reversal. Judge Noonan takes the latter view; Judge Schroeder contends that the *Chapman* standard applies.

In my opinion, the clearest reading that can be given to footnote nine is that the Court considers footnote nine error to be of the structural variety, requiring automatic reversal. What I consider to be the strongest support for this view is the citation in footnote nine to Justice Stevens' concurring opinion in *Greer v. Miller,* where he wrote:

In *Rose v. Lundy,* 455 U.S. 509 [102 S.Ct. 1198, 71 L.Ed.2d 379] (1982), I argued that there are at least four types of alleged constitutional errors.

"The one most frequently encountered is a claim that attaches a constitutional label to a set of facts that does not disclose a violation of any constitutional right.... The second class includes constitutional violations that are not of sufficient import in a particular case to justify reversal even on direct appeal, when the evidence is still fresh and a fair retrial could be promptly conducted. A third category includes errors that are important enough to require reversal on direct appeal but do not reveal the kind of fundamental unfairness to the accused that will support a collateral attack on a final judgment. The fourth category includes those errors that are so fundamental that they infect the validity of the underlying judgment itself, or the integrity of the process by which that judgment was obtained." [*Rose v. Lundy* ], at 543–544 [102 S.Ct. at 1216–1217] (dissenting opinion) (footnote omitted).

In my view, *Doyle* violations which cannot be deemed harmless beyond a reasonable doubt typically fall within the third of these categories. On direct review, a conviction should be reversed if a defendant can demonstrate that a *Doyle* error occurred at trial, and the State cannot demonstrate that it is harmless beyond a rea-

sonable doubt. But, in typical collateral attacks, such as today's, *Doyle* errors are not so fundamentally unfair that convictions must be reversed whenever the State cannot bear the heavy burden of proving that the error was harmless beyond a reasonable doubt. *On the other hand, there may be extraordinary cases in which the Doyle error is so egregious, or is combined with other errors or incidents of prosecutorial misconduct, that the integrity of the process is called into question. In such an event, habeas corpus relief should be afforded.*

483 U.S. 756, 768–69, 107 S.Ct. 3102, 3110–3111 (Stevens, J., concurring) (citations omitted) (emphasis added; emphasis from original deleted).[1]

I think the citation to *Greer* seals it. The Court's language in footnote nine parallel's the emphasized portion of Justice Stevens' concurrence in *Greer;* and whereas footnote nine doesn't come right out and say it, Justice Stevens did: in the "extraordinary"/footnote nine case, "habeas relief should be afforded." Neither footnote nine nor Justice Stevens mentions anything about harmless error review. It is clear to me that both the *Brecht* Court and Justice Stevens place the footnote nine case, which "infect[s] the integrity of the proceedings," in the fourth category of constitutional errors.

Although Judge Schroeder advances fine reasoning in support of her position, I support Judge Noonan's interpretation, which reflects the intent of the *Brecht* Court.

---

**1.** Footnote nine cites only 483 U.S. at page 769, 107 S.Ct. at page 3111 of the *Greer* concurrence, which includes only the portion of the quotation that I have emphasized. I have included the paragraphs preceding the emphasized portion for purposes of context.