CHRISTEN, Circuit Judge,
concurring:
I agree that Petrocelli’s death sentence must be reversed. I write separately because, in my view, even if the State could show that the prosecutor’s tactics had not prejudiced the jury’s verdict, Petrocelli’s case is one of the very few in which deliberate prosecutorial misconduct and egregious trial errors warrant habeas relief. See Brecht v. Abrahamson, 507 U.S. 619, 638 n.9, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (stating that a deliberate and especially egregious trial error, or one that is combined with a pattern of prosecutorial misconduct, might warrant habeas relief, even if the jury’s verdict is not substantially influenced). Brecht’s footnote nine is rarely employed, but. the Fifth and Seventh Circuits have each relied on it one time in cases where an error (or errors) did not easily fit into either the “structural error” or “trial error” category. The errors in Petrocelli’s case were equally pervasive, flouted Supreme Court authority, and undermined the integrity of the criminal justice process.
Tracy Petrocelli’s trial, from voir dire to the death penalty verdict, lasted just ten days (July 26-30, 1982; August 2-6, 1982). The penalty phase took one day. The introduction of evidence began at 11:30 AM on August 6, and the jury’s verdict, a death sentence, was returned at 10:52 PM. The defense introduced brief psychiatric reports but only called Petrocelli to testify. The prosecution called Dr. Gerow, a psychiatrist, to testify about Petrocelli’s mental condition. The majority opinion thoroughly and persuasively, explains how the prosecutor procured Dr. Gerow’s testimony and why the prosecutor’s conduct was a flagrant violation of Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (holding that a psychiatrist’s testimony about the defendant’s future dangerousness in a capital felony trial violated the defendant’s Fifth and Sixth Amendment rights where the defendant was not given Miranda warnings before his psychiatric examination),
A separate layer of error also infected this trial because the State’s Estelle viola *732 tion dovetailed with an inflammatory jury instruction.. Specifically,-the trial court told the jury that “[u]nder the laws of the State of Nevada, ,.. [t]he. .State Board of Pardon Commissioners ... would have the powei" to modify any sentence at a later date.” The prosecution told the jury that Petrocelli might someday walk the streets “[a]mong ordinary people” and “kill again” if the jury did not sentence him to death. The context and nature of these combined errors and misconduct so infected the integrity of the proceedings as to defy categorization and the typical harmlessness analysis.
Brecht’s harmless-error standard applies pn collateral review of federal constitutional trial errors. See Brecht, 507 U.S. at 622, 113 S.Ct. 1710. Typically, “[t]rial error ‘occur[s] during the presentation of the case to the jury/ and is amenable to harmless-error analysis because it ‘may ... be quantitatively assessed in the context .of other evidence presented in order to determine [the effect it had on the trial].’ ” Id. at 629, 113 S¡Ct. 1710 (alterations in original) (quoting Arizona v. Fulminante, 499 U.S. 279, 307-08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). Prosecutorial misconduct is trial error. See Wood v. Ryan, 693 F.3d 1104, 1113 (9th Cir. 2012). “At the other end of the spectrum of constitutional errors lie ‘structural defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards.’” Brecht, 507 U.S. at 629, 113 S.Ct. 1710 (quoting Fulminante, 499 U.S. at 309, 111 S.Ct. 1246). Structural errors, such as the deprivation of the right to counsel,, “infect the entire trial process” and require automatic reversal of the conviction. Id. at 629-30, 113 S.Ct. 1710; see also Hardnett v. Marshall, 25 F.3d 875, 879 (9th Cir. 1994) (stating that unlike trial errors, , structural errors “may not be considered harmless”).
“Not every error, however, is easily shoe-horned into one of those neat categories.” United States v. Harbin, 250 F.3d 532, 544 (7th Cir. 2001). “The nature, context, and significance of the -violation, for instance, may determine whether automatic reversal or the harmless error analysis is appropriate.” Id. (internal quotation marks and citation omitted). In footnote nine of Brecht, the Supreme Court left open the. possibility “that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury’s verdict.” 507 U.S. at 638 n.9, 113 S.Ct. 1710. “This hybrid, [footnote [n]ine error as we denominate it, is thus assimilated to structural error and declared to be incapable of redemption by actual prejudice analysis.” Hardnett, 25 F.3d at 879. “The integrity of the trial, having, been destroyed, cannot be reconstituted by an appellate court.” Id.
In Petrocelli’s case, the first error arose when the prosecutor used a psychiatrist to interview Petrocelli without informing his lawyer or advising him of his right to remain silent. The Supreme Court held in Estelle that the prosecution may not rely on statements made by a defendant during a psychiatric examination to prove future dangerousness if the defendant was not apprised of his Miranda rights and was denied the assistance of his counsel in deciding whether to submit to the examination. 451 U.S. at 467-71, 101 S.Ct. 1866 (“When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent’s future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a *733 postarrest custodial setting.”) Decided in May of 1981, Estelle had been on the books for about a year when the state prosecutor enlisted Dr. Gerow to interview Petrocelli, and it had been controlling law for about fifteen months by the time the prosecutor called Dr. Gerow to testify. Despite Estelle’s clear rule that the government may not circumvent Miranda by using a health care professional as an agent to interview a defendant without the benefit of defense counsel, the prosecutor responded to Pe-trocelli’s request for psychiatric help by sending Dr, Gerow to the jail to interview Petrocelli under the pretense of providing mental health counseling. There is no question that the prosecutor’s goal was to use the result of the interview to prosecute Petrocelli, not to respond to Petroeelli’s request for mental health counseling. The prosecutor later said as much, as did Dr. Gerow. It is equally clear that Petrocelli could not have anticipated that the doctor would testify for the prosecution.
In state post-conviction proceedings, the prosecutor testified and agreed that he asked Dr. Gerow to interview Petrocelli because he was concerned about a possible competency or insanity defense. The prosecutor testified that he “want[ed] to see what ma[de] [Petrocelli] tick,”- and also candidly admitted that he sent .Dr. Gerow to interview Petrocelli for “a dual purpose.” According to, the prosecutor, “Mr. Petrocelli wanted to see á counselor, a psychiatrist. I wanted him to be seen by one in order to make sure that we had a competent defendant.” The prosecutor selected Dr. Gerow, as opposed to another psychiatrist or psychologist, because he “had a lot of trust in Dr. Gerow.” Despite the rule-from Estelle, the prosecutor recalled that he had not instructed Dr. Ger-ow to tell Petrocelli that he was there at the request of the prosecution, that he had not instructed Dr. Gerow to advise Petro-celli of his Miranda rights, and that he had not instructed Dr. Gerow about what to do if Petrocelli mentioned that he was represented by counsel-all because Dr. Gerow was supposedly seeing Petrocelli “jointly.” Although the prosecutor described the' -interview as having a “dual purpose,” defense counsel Lawrence Wis-hart denied that there was any joint defense purpose for the interview. He was not informed of the interview, nor consulted about the selection of the expert. In fact, Wishart was-familiar with this psychiatrist, and he testified that he would not have hired Dr.- Gerow because he thought Dr. Gerow had “a prosecution bias.”
. Dr. Gerow also testified in the post-conviction proceedings. He described conferring with the prosecutor by telephone before meeting with Petrocelli, and acknowledged that he met with Petrocelli on April 21, Í982, at the prosecutor’s request, to determine whether Petrocelli was competent to .stand trial and to assess Petrocelli’s ability to .distinguish right from wrong. Dr. Gerow doubted very much that the prosecutor instructed him to advise Petrocelli of his Miranda rights, and he was definite in his testimony that he did not do so. He also confirmed that when he wrote in his one-page letter report to the prosecutor that he would see Petrocelli again “as needed,” he meant as needed by the prosecution, not as needed by Petrocelli.[1] In short, the record shows that Dr. *734 Gerow’s interview with Petrocelli had no therapeutic purpose; it was arranged to advance the prosecution’s case in blatant violation of Estelle. -
The prosecution exploited its Estelle violation to full advantage at trial.[2] Having interviewed Petrocelli without informing him of his Miranda rights and without notifying Petrocelli’s counsel, Dr. Gerow told the jury that he had diagnosed Petrocelli as “a psychopathic.” He testified that although the “violence potential” of psychopaths “varies,” the most concerning traits associated with psychopaths (incurability, callousness, a high propensity for violence) “describe[ ] [Petrocelli] quite well.” Dr. Gerow’s last statement on direct examination went to Petrocelli’s future dangerousness. He told the jury: “There is no cure.” The prosecution’s closing argument summarized the reports of the doctors who had evaluated Petrocelli, but relied most heavily On Dr. Gerow’s testimony. The prosecutor adopted Dr. Gerow’s terminology, referring to Petrocelli ás “a ... psychopathic,” and ended his remarks about Petrocelli’s “psychopathic” diagnosis by saying: “And we can go to Dr. Gerow.'..'. [T]he sad and terrifying fact is [Petrocelli] will continue to do this.”
To make matters worse, the prosecutor emphatically, repeatedly, and definitively emphasized that Petrocelli could someday be released if the jury did not sentence him to death. The prosecutor asked the jury: “Should the community bear the risk of ever having this defendant on the street again, walking free, on the run?” He elaborated:
What psychopath means, éssentially, is a mean, bad ' person who has never changed and who will continue to victimize.... [N]o society, no community, no county, no city, no state, should ever have to risk again Tracy Petrocelli on the street. They should not have to risk their fathers or daughters, or their brothers or themselves, that he might take a fancy to killing them as he has done, as you see from the people in this case....
In his rebuttal, the prosecutor continued:
But ladies and gentlemen, I ask you to consider years down the road when the decisions are being made at the Pardons Board and the Parole Board and we have all gone our separate ways and Mr.. Petrocelli is there, the sole person applying for the pardon or applying for parole crying tears of remorse and telling the people how it wasn’t he who was the murderer of Mr. Wilson it was an accident and he got railroaded, and telling people that it wasn’t he who was the murderer of Melanie it was an accident, and he was railroaded.
Contrary to these statements, Petrocelli categorically was ineligible for parole under a statute passed by the Nevada legislature just months before his sentencing because he was on probation when he *735 murdered James Wilson. Had the jury sentenced Petrocelli to life in prison without the possibility of parole, the prosecutor could not have known whether the State Board of Pardon Commissioners (Board) would have had the power to release him. See Nev. Rev. Stat. § 213.1099(4)(e) (prohibiting the reduction of a sentence to one allowing parole if the convicted individual had “[failed] in parole, probation, work release or similar programs”).[3]
There is no question the prosecutor was aware that Petrocelli was on probation and had failed in “similar programs” at the time of this crime. Petrocelli had been convicted of kidnaping and he had twice left a drug treatment program. The prosecutor argued that Petrocelli’s previous conviction for kidnaping should be treated as an aggravating factor, and he cross-examined Petrocelli about leaving the drug treatment program.
On appeal, the State’s defense of Jury Instruction 5 and the prosecutor’s unequivocal statement that Petrocelli could be granted parole if not sentenced to death, is that, before the statutory amendment, Nevada’s Board generally had the authority to commute a sentence of life without the possibility of parole. But Petrocelli was on probation at the time of this crime and had twice absconded from a drug rehabilitation program. The Nevada Supreme Court declined to grant Petrocelli relief on the basis of Jury Instruction 5, but it directed trial courts to tell future juries: “Life imprisonment without the possibility of parole means exactly what it says, that the Defendant shall not be eligible for parole.” Petrocelli v. State, 101 Nev. 46, 692 P.2d 503, 511 (1985), holding modified after statutory amendment by Sonner v. State, 112 Nev. 1328, 930 P.2d 707 (1996).
The backdrop for the prosecutor’s egregious Estelle trial error was this definitive statement of Nevada law suggesting the possibility of parole, which the prosecutor hammered during closing argument. If this combination does not put Petrocelli’s case in Brecht’s footnote nine category, the scale certainly tips when one considers that these were not isolated incidents or inadvertent mistakes. In September 1983, the same prosecutor’s office called Dr. Gerow to testify about a defendant’s future dangerousness during the penalty phase of another death penalty case, Sechrest v. Ignacio, 549 F.3d 789, 798-99 (9th Cir. 2008). In Sechrest, Dr. Gerow was originally hired by defense counsel but he switched sides to become a prosecution witness. See id, at 816. Our decision in that case explains that Dr. Gerow interviewed Sechrest without giving him Miranda warnings or otherwise informing the defendant or his counsel that he might testify for the prosecution. See id. at 798-99. We concluded in Sechrest that “Dr. Gerow’s testimony that [the defendant] was extremely dangerous and could not be rehabilitated likely had a substantial influence on the jury’s decision to sentence [the defendant] to death.” Id. at 813.
Further, Petrocelli’s trial was not the last capital case in which this prosecutor’s office inaccurately represented that the defendant categorically would' be eligible for parole if the jury did not impose the death sentence. In Sechrest, decided after § 213.1099(4) became effective, the prosecution told the jury that “the Board of Pardon Commissioners could change [the defendant’s] sentence,” id. at 798, and warned that if it did not impose a death sentence, it was “risking] the life of some other person or child,” id. at 811 (altera *736 tion in original). As a matter of fact and law, that was not true. Sechrest was ineligible for parole because he was On probation at the time he committed his offense, but an inaccurate jury instruction “reinforced the prosecutor’s argument that the Board of Pardon Commissioners was the entity responsible for deciding Sechrest’s term of imprisonment.” Id. at 812.
In Sechrest we held: “Bottom line: the prosecutor misled the- jurors to believe that if they did not impose the death penalty, [the defendant] could be released on parole and would kill again. In making his eiToneous assertions, the prosecutor ... most likely inflamed the passions of the jury.” Id. at 812. Sechrest establishes that this prosecutor’s office had a game plan to disingenuously scare the jury- about the likelihood that the defendant might be released to walk-Reno’s streets again.
In my view, Petrocelli’s appeal presents “the unusual case where the combination of misconduct and error infected the entire proceeding.” Hardnett, 25 F.3d at 880 (internal quotation marks omitted). The prosecution’s misuse' of Dr. Gerow, coupled with the inflammatory and misleading statements of Nevada law it used in at least two capital cases, pushes this case across the line into footnote nine error of the sort that led two other appellate courts to grant habeas relief. See United States v. Bowen, 799 F.3d 336 (5th Cir. 2015); United States v. Harbin, 250 F.3d 532, 545 (7th Cir. 2001).
Bowen arose from the prosecution of five former police officers involved in the killing of two unarmed men after Hurricane Katrina (the “Danziger Bridge shootings”) and an alleged cover-up. Bowen, 799 F.3d at 339-40. Federal prosecutors in charge of the case engaged in a series of “ethical lapses” during the high-profile trial. Id. at 339. Although the Fifth Circuit could not conclude that the prosecutorial misconduct was “outcome-determinative,” id. at 356, the court held that footnote nine error occurred when prosecutors leaked confidential information, anonymously posted on online news sources, and withheld information from the district court, id. at 339-46, 353-54. According to the Fifth Circuit: “The [prosecutors’] online commenting alone, which breached all standards of prosecutorial ethics, gave the government a surreptitious advantage in influencing public opinion, the venire panel, and the trial itself.” Id, at 363. “This case thus presents the unclassiflable and pervasive errors to which the Supreme Court referred in Brecht when it identified a category of errors capable of infecting the integrity of the prosecution to a degree warranting a new trial irrespective of prejudice,” Id.
■The Seventh Circuit considered an egregious error that similarly tipped the scales in favor of the prosecution in Harbin, There, the prosecution, but not the defense, = was allowed to “save” a peremptory juror challenge until the sixth day of an eight-day trial. See 250 F,3d at 537-39. Although no one argued that the alternate juror who replaced the excused juror was biased, the Seventh Circuit held that the error defied the typical harmless error analysis, should be treated as structural, and required reversal, in, accord with the “footnote nine exception.” See id. at 544-48. The Seventh Circuit reasoned: “[T]he error was serious enough to effect a shift in the total balance of advantages in favor of the prosecution, which ... could deprive defendants of a fair trial.” Id. at 547.
So too here. The prosecutor’s Estelle violation and other misconduct shifted the total balance of the penalty phase. This misconduct was deliberate, and egregious, and it compromised the integrity of the trial to a degree warranting a new sentencing trial with or without a showing *737 that the errors actually influenced the jury’s verdict.
For these reasons, I respectfully concur in the majority opinion, but I would also grant habeas relief based on Brecht’s footnote nine.

. Dr. Gerow’s report verifies that he examined Petrocelli at the prosecutor's request, that Petrocelli was cooperative and an able historian, and that a mental status examination was performed. In seven lines of text, a single paragraph summarizes Petrocelli’s social history from childhood, his mental health history from childhood, and the impression that he was not psychotic when interviewed. The letter then deems Petrocelli competent to stand trial, and states that Dr. Gerow will see Petrocelli again on an "as needed” basis.

. The State relies heavily on the Nevada Supreme Court's ruling that even if Petrocelli had properly preserved his claim that Dr, Gerow’s interview violated Miranda v. Arizona, Petrocelli failed to show that it prejudiced him in light of other compelling testimony about future dangerousness, The State also repeats the Nevada trial court's factual errors and raises most of the arguments that the majority opinion addresses: (1) the incorrect statement that Petrocelli had not yet been appointed counsel when Dr. Gerow interviewed him; (2) the incorrect statement that Dr. Gerow, informed Petrocelli that he would see him again on an " 'as needed’ basis”; (3) that it is not entirely clear for what purpose Dr. Gerow saw Petrocelli (perhaps not as an agent of the prosecutor); and (4) that any error was harmless because "[t]he jury heard other compelling evidence about Petrocelli’s violent propensities during the guilt phase of his trial.” Like the majority, I conclude that the State has not raised any persuasive defense to the-alleged Estelle violation.'

. The implementation of § 213.1099(4) was contingent upon passage of a constitutional amendment that was put to the voters three months after Petrocelli’s sentencing, and the retroactivity of the statute had not yet been determined.